UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| MARIETTA ROBINSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Case No. 12-0302 (RJL) |
| | ) | |
| SARAH PEZZAT, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

MEMORANDUM OPINION
(March /8, 2015) [Dkt. #24]

FILED
MAR 19 2015
Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

Plaintiff Marietta Robinson ("plaintiff") brought this action against the District of Columbia and District of Columbia Metropolitan Police Department ("MPD") Officers Sarah Pezzat, Christian Glynn, Richard McLeod, James Boteler, and Kelly Baker[1] (collectively, "defendants"), seeking damages for violations of 42 U.S.C. § 1983 and various common law torts, stemming from the killing of her dog during the execution of a search warrant. *See* Complaint ("Compl.") ¶¶ 1, 3 [Dkt. #1]. Now before the Court is defendants' Motion for Summary Judgment. *See* Defs.' Mot. for Summ. J. ("Defs.' Mot.") [Dkt. #24]. Upon consideration of the parties' pleadings, relevant law, and the entire record in this case, the Court GRANTS defendants' Motion for Summary

---

[1] Plaintiff also named MPD officers Adrian Ledesma, Adam Johnston, Kimberly Selby, and Vincent Hopkins as defendants in this action. *See* Compl. On March 7, 2014, however, plaintiff stipulated to their dismissal—with prejudice—from this action. *See* Praecipe of Dismissal [Dkt. #21].

1

Judgment as to Counts I, II, and III of the Complaint and DISMISSES the remaining Counts IV, V, VI, VII, and VIII of the Complaint WITHOUT PREJUDICE.

## BACKGROUND

On June 3, 2010, nearly two weeks prior to the events at issue, MPD officers arrested plaintiff's grandson, Kevin Jackson ("Jackson"), for possession of marijuana with intent to distribute. Defs.' Statement of Material Facts as to Which There is No Genuine Dispute ("Defs.' SOMF") ¶¶ 8, 12 [Dkt. #24-2]. Jackson informed the arresting officers that he resided with plaintiff at 1338 Fifth Street, N.W. in Washington, D.C. Defs.' SOMF ¶ 14. Shortly thereafter, on June 8, 2010, the D.C. Superior Court issued a search warrant, authorizing the MPD to search plaintiff's home for drug paraphernalia.[2] Defs.' SOMF ¶ 18; see Defs.' Mot. Ex. 5(b) [Dkt. #24-8]. Prior to executing the search warrant, MPD Officers Baker and Boteler surveilled plaintiff's residence but did not see any evidence that plaintiff owned a dog. Defs.' SOMF ¶¶ 58-59.

When the defendant officers arrived at plaintiff's residence on June 15, 2010 to execute the search warrant, plaintiff answered the door with her thirteen-year-old pit bull mix—Wrinkles—by her side. Compl. ¶¶ 3, 5; see Defs.' SOMF ¶ 1. Wrinkles, was, by all accounts, a dog with aggressive tendencies. Veterinary reports state that Wrinkles frequently barked and growled at veterinary staff and had to be muzzled during routine examinations. Defs.' SOMF ¶¶ 4-5. This behavior was not confined to veterinary visits. At home, Wrinkles often barked and growled at strangers entering plaintiff's house,

---

[2] The parties do not dispute the validity of the search warrant. Pl.'s Mem. of P. & A. in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Opp'n), at 13 [Dkt. #26-1].

prompting plaintiff to sequester Wrinkles in the first floor bathroom when the dog appeared agitated. Defs.' SOMF ¶¶ 6-7; Def's Mot. Ex. 1, at 17:3-19 [Dkt. #24-3]. Wrinkles heralded the MPD officers' arrival on June 15, 2010 in much the same way. Indeed, when the officers arrived on plaintiff's doorstep and announced their intention to search her residence, Wrinkles began growling and barking loudly. Defs.' SOMF ¶¶ 19-20, 24. Several MPD officers characterized Wrinkles' behavior as "aggressive," and at least one officer testified that Wrinkles "snarled" at the search team. *See* Defs.' Mot. Ex. 8, at 112:10-14 [Dkt. #24-11]; Defs.' Mot. Ex. 9, at 18:4-11 [Dkt. #24-12]. After obtaining the officers' permission, plaintiff secured Wrinkles in the first floor bathroom and the officers entered the house. *See* Compl. ¶¶ 6, 8; Defs.' SOMF ¶¶ 25-26. Officer Pezzat, a woman weighing less than one-hundred pounds, opened the bathroom door, apparently unaware that Wrinkles had been placed therein. Defs.' SOMF ¶¶ 30-31.

Thereafter, the parties' recollections diverge. Plaintiff testified that immediately after opening the bathroom door, Officer Pezzat fired a shot at Wrinkles, who was lying prone on the bathroom floor. *See* Pl.'s Statement of Genuine Issues and Resp. to Defs.' Statement of Undisputed Facts ("Pl.'s SOMF") ¶ 32(b) [Dkt. #26-2]. According to plaintiff, it was only after being shot that Wrinkles sprang to action and bit Officer Pezzat on the foot. *See* "Pl.'s SOMF" ¶ 32(b). The MPD officers present at the scene, however, recall a different sequence of events. According to several officers, immediately upon opening the bathroom door, Officer Pezzat was besieged by Wrinkles, who bit her on the foot, shook vigorously, and began dragging her toward the bathroom. *See* Defs.' SOMF ¶ 32; Defs.' Mot. Ex. 10, at 59:16-19 [Dkt. #24-13]. The bite pierced Officer Pezzat's

3

steel-toed boots and punctured her foot. *See* Defs.' SOMF ¶¶ 40-41. Officer Pezzat knew that she "had to make a decision right then and there." Defs.' Mot. Ex. 7, at 85:15-16 [Dkt. #24-10]. She testified that "[t]he thought in my mind at the time was that [pepper spray] wasn't going to be effective. . . . I was starting to feel pain from the bite, and I knew I had to do something quick and decisive." Defs.' Mot. Ex. 7, at 85:13-19. Motivated by fears that if she fell, Wrinkles could seize her throat or injure a vital organ, Officer Pezzat opted to discharge her weapon. *See* Defs.' SOMF ¶ 44; Defs.' Mot. Ex. 10, at 60:14-18. Officer Glynn, who was standing immediately behind Officer Pezzat and witnessed the events unfold, simultaneously drew, and discharged, his weapon. Defs.' Mot. Ex. 10, at 58:1-63:1. This version of events is corroborated by several eyewitness accounts. Officer McLeod testified:

> "Once we walked into [plaintiff's residence], I heard behind me snarling again. I turned around to see that the dog had bitten Officer Pezzat and was holding on to her foot. . . . I saw the dog grabbing ahold of her foot and shaking his head and pulling her. A brief struggle, then I heard two shots, then the dog charged towards myself . . . ."

Defs.' Mot. Ex. 4, at 31:19-32:5 [Dkt. #24-6]. Officer Johnston likewise testified: "a dog came growling, bit Officer Pezzat in the foot, was pulling her down, biting her foot, her left foot . . . . That's when Officer Pezzat and Officer Glynn fired their service weapon[s]."[3] Defs.' Mot. Ex. 9, at 19:2-8 [Dkt. #24-12]. Neither party disputes that

---

[3] Similarly, Officer Boteler testified: "I saw the dog on Pezzat's foot. I can't say I saw her shoot the dog. I saw the dog on her foot and I saw her shaking her foot, and then I heard a gunshot and then I heard another gunshot." Defs.' Mot. Ex. 8, at 99:8-11 [Dkt. #24-11]. Officer Glynn confirmed that sequence of events: "As [Officer Pezzat] attempted to free her foot, and failing to

4

Officer Pezzat sought immediate medical treatment for her injuries. *See* Pl.'s SOMF ¶ 45.

Both parties agree, moreover, that after Officers Glynn and Pezzat fired their weapons, Wrinkles ran out of the bathroom toward Officer McLeod. *See* Defs.' SOMF ¶ 34; *see* Defs.' Mot. Ex. 11, at 104:21-22 [Dkt. # 24-14] ("After the shots the dog started coming toward [Officer Hopkins], Officer McLeod and Officer Ledesma."). Upon seeing Wrinkles emerge, Officer McLeod discharged his weapon and continued to fire until Wrinkles changed course and headed toward the staircase, where Officers Ledesma and Hopkins were standing. Defs.' SOMF ¶¶ 35-36; *see* Defs.' Mot. Ex. 4, at 43:18-21, 44:17-22. Wrinkles' trajectory forced Officers Ledesma and Hopkins to back up the stairs in search of safety. Defs.' SOMF ¶ 38. According to Officer Ledesma, because "the dog kept coming towards us and [tried] to get to us," she was forced to deploy a protective shield. Def.'s Mot. Ex. 12, at 25:7-13 [Dkt. #24-15]. The dog continued its assent for another few steps before succumbing to its injuries and falling to the base of the stairs. Defs.' Mot. Ex. 1, at 48:19-22. Plaintiff alleges that the entire incident left approximately twelve bullet holes in her residence. Compl. ¶ 63.

After Wrinkles died, Sergeant Boteler, another of the officers present at the scene, used plaintiff's sheets to cover the deceased animal. Defs.' SOMF ¶ 51; *see* Compl. ¶ 15. The officers, meanwhile, continued to search plaintiff's residence for the contraband enumerated in the search warrant. Defs.' SOMF ¶ 53. Plaintiff alleges that during the

---

do so and the dog pulling her, both she and I unholstered our weapons and fired, either her immediately before me or almost simultaneously." Defs.' Mot. Ex. 10, at 60:21-61:2.

search, the officers wiped their bloody hands on her sofa, "rinsed off blood from the shooting in Plaintiff's drinking water fountain," and destroyed photographs, artwork, and clothing. See Compl. ¶¶ 14-16, 155.

Plaintiff commenced this action on February 24, 2012, alleging violations of her Constitutional rights under 42 U.S.C. § 1983 (Counts I-III) and a kaleidoscope of common law torts, including assault (Count IV), intentional infliction of emotional distress (Count V), negligent infliction of emotional distress (Count VI), negligence (Count VII), and conversion (Count VIII). See generally Compl. Defendants moved for summary judgment on June 9, 2014, Defs.' Mot., and plaintiff timely opposed, see Pl.'s Opp'n.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper where the pleadings, stipulations, affidavits, and admissions in a case show that there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The court must accept as true the evidence of, and draw "all justifiable inferences" in favor of, the party opposing summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The nonmoving party may not rest upon the laurels of its pleadings. Rather, it is incumbent on the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Id.* at 256. A genuine issue exists when the evidence is more than "merely colorable," *id.* at 249, such that a reasonable jury could return a verdict for the nonmoving party," *id.* at 248. Summary judgment is thus proper "against a party who fails to make a showing sufficient to

establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

## ANALYSIS

### I.   Section 1983 Claims Against Defendant Officers (Counts I and II) [4]

42 U.S.C. § 1983 provides a right of action to claimants alleging that a person acting under color of District of Columbia law deprived, or caused them to be deprived, of a Constitutional right. *City of Okla. City v. Tuttle*, 471 U.S. 808, 829 (1985). Plaintiff here alleges that the defendant MPD officers committed two such Constitutional violations—specifically, violations of the Fourth and Fifth Amendments—stemming from the shooting of her dog and the destruction of her personal property. Unfortunately for plaintiff, I find these claims unavailing.

#### A.   Fifth Amendment Claims (Counts I and II)

Plaintiff first claims that defendants' search of her house and the seizure of her dog violated Fifth Amendment substantive due process. *See* Compl. ¶¶ 78-111. These claims fail as a matter of law. It is well-settled that "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort

---

[4] Plaintiff brings Counts I and II against the defendant MPD officers in their individual and official capacities. Claims against officers in their official capacities are "another way of pleading an action against an entity of which its officer is an agent" and are properly pled as claims against the "government entity itself." *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) (quoting *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)). "Based upon the understanding that it is duplicative to name both a government entity and the entity's employees in their official capacity[ies], courts have routinely dismissed corresponding claims against individuals named in their official capacity as redundant and an inefficient use of judicial resources." *Robinson v. District of Columbia*, 403 F. Supp. 2d 39, 49 (D.D.C. 2005) (internal quotation marks omitted). I will do the same and consider only the claims against defendants in their individual capacities.

of government behavior, 'that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing [a party's] claims." *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). The Fourth Amendment expressly governs the genus of pretrial deprivations alleged in this action—the seizure of plaintiff's personal property. *See Elkins v. District of Columbia*, 690 F.3d 554, 562 (D.C. Cir. 2012) (holding that plaintiff could not "use the search of her home or the seizure of documents as grounds for a claim under the Fifth Amendment" because "[t]he remedy for any harm to [plaintiff] from the search of her home is governed by the Fourth Amendment"); *see also Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014) ("A claim that law-enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's 'reasonableness' standard."); *Graham*, 490 U.S. at 395 (holding that claims of excessive force during a "'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach"). Accordingly, any constitutional harm to plaintiff arising from the search and seizure of her property is governed exclusively by the Fourth Amendment, to which I now turn.[5]

---

[5] Even assuming, *arguendo*, that plaintiff could articulate an independent claim under the Fifth Amendment, that claim fails because the defendants' actions cannot "properly be characterized as arbitrary, or conscience-shocking, in a constitutional sense." *See Robinson v. District of Columbia*, 736 F. Supp. 2d 254, 261 (D.D.C. 2010) (quoting *Collins v. Harker Heights*, 503 U.S. 115, 128 (1992)). "[O]nly a purpose to cause harm *unrelated to the legitimate object* [of the police action] will satisfy the element of arbitrary conduct shocking to the conscience, necessary for a due process violation." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 836 (1998) (emphasis added); *Silverman v. Barry*, 845 F.2d 1072, 1080 (D.C. Cir. 1988) (stating that Fifth Amendment violations are limited to situations in which the government has engaged in "[1] a substantial infringement of state law prompted by personal or group animus, or [2] a deliberate flouting of the law that trammels significant personal or property rights"). This is plainly not a situation in

8

### B.      Fourth Amendment Claims (Counts I and II)

Plaintiff alleges in the alternative that the defendant officers' search of her residence and shooting of her dog violated her Fourth Amendment rights. *See* Compl. ¶¶ 93, 109. I disagree. Although 42 U.S.C. § 1983 provides a private right of action for Fourth Amendment violations, municipal employees acting within the scope of their official duties may raise qualified immunity as a defense to § 1983 claims "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). When analyzing the merits of a qualified immunity defense, the Court first inquires whether the plaintiff has established a constitutional injury. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *modified by Pearson v. Callahan*, 555 U.S. 223 (2009). If no such injury is established by a preponderance of the evidence, the inquiry ends there. *Id.* If, however, the Court finds a constitutional violation, it must determine whether the contours of the infringed right are sufficiently clear to hold the government actor liable for its infraction.[6] *Id.*

The touchstone of the inquiry here is the Fourth Amendment, which protects against "unreasonable searches and seizures." U.S. Const. amend. IV. A seizure occurs

---

which defendants gratuitously killed plaintiff's dog. As discussed further herein, the shooting, which was motivated by legitimate safety concerns, was related to an authorized search of plaintiff's residence. Therefore, it does not rise to the level of egregiousness remedied by the Fifth Amendment.

[6] Although *Saucier*'s two-prong analysis remains controlling, the Supreme Court has since clarified that courts have discretion as to which prong they consider first. *See Pearson*, 555 U.S. at 242 ("Because the two-step *Saucier* procedure is often, but not always, advantageous, the judges of the district courts and the courts of appeals are in the best position to determine the order of decisionmaking that will facilitate the fair and efficient disposition of each case."). I find the *Saucier* procedure most advantageous here and, accordingly, follow its lead.

when "there is some meaningful interference with an individual's possessory interests in [his] property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). Plaintiff's claim is predicated on two such seizures: the killing of her dog and the damage to her personal property caused by defendants' search. *See* Compl. ¶¶ 93, 109. I begin with plaintiff's claim that MPD Officers Pezzat, Glynn, and McLeod violated her Fourth Amendment rights by shooting her dog.

A police officer's killing of a dog is an indisputable seizure of personal property. *See, e.g., Viilo v. Eyre*, 547 F.3d 707, 710 (7th Cir. 2008); *San Jose Charter of the Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 975 (9th Cir. 2005); *Brown v. Muhlenberg*, 269 F.3d 205, 210 (3d Cir. 2001). The sole question is whether such a seizure is constitutional. For a warrantless seizure to be constitutional, it must have been reasonable, meaning that the governmental interests justifying the seizure must outweigh the deprivation caused by its intrusion. *Graham*, 490 U.S. at 396. Reasonableness cannot be divined in a vacuum and its calculus allows "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Id.* at 396-97.

The equities appear, at first blush, equally weighted. Plaintiff had a cognizable interest in ensuring the safety of her pet and the government had a countervailing interest in the safety of its officers. However, because the state's interest is most robust when the lives of its officers are in immediate danger, even "the extreme intrusion occasioned by the destruction of [a] pet" is justified if the animal poses an imminent threat. *See Brown*, 269 F.3d at 210-11. Thus, if the Court finds—and I do—that plaintiff's dog

10

constituted such a threat, the balance tips in favor of reasonableness. *See id.*; *Hatch v. Grosinger*, 01civ1906(RHK/AJB), 2003 WL 1610778, at *5 (D. Minn. Mar. 3, 2003) (finding a seizure reasonable where the dog was an immediate danger).

There is no genuine dispute that Wrinkles posed an imminent threat. Plaintiff argues that her uncorroborated version of events creates a genuine issue of material fact precluding summary judgment. *See* Pl.'s Opp'n, at 8. I disagree. To withstand summary judgment, a plaintiff must advance more than a scintilla of doubt as to her claims. *Cobbs v. Bluemercury, Inc.*, 746 F. Supp. 2d 137, 141 (D.D.C. 2010). Unsubstantiated allegations of harm fall short of this standard, making dismissal imminently more likely where, as here, a plaintiff's claims are contradicted, and overborn, by a record of credible evidence. *See Arrington v. United States*, 473 F.3d 329, 342-43 (D.C. Cir. 2006) ("[S]ummary judgment 'is *most likely* when a plaintiff's claim is supported solely by the plaintiff's own self-serving testimony, unsupported by corroborating evidence, and undermined . . . by other credible evidence.'" (quoting *Johnson v. Wash. Metro. Area Transit Auth.*, 883 F.2d 125, 128 (D.C. Cir. 1989))). Indeed, several undisputed facts corroborate defendants' account and support an inference that Officers Pezzat, Glynn, and McLeod shot Wrinkles because the dog was a clear and present threat. Neither party disagrees that Wrinkles had a history of aggression. *See* Pl.'s SOMF ¶¶ 2-6. Nor is there any dispute that when the MPD officers arrived at plaintiff's residence on the night of June 15, 2010, Wrinkles barked and growled at the search team, prompting plaintiff to place the dog in the downstairs bathroom. *See* Pl.'s SOMF ¶¶ 20, 25-27, 47. The parties agree that Wrinkles bit, shook, and attempted to bodily drag Officer Pezzat into the

bathroom, leaving bite marks in her steel-toed boots and injuring her foot. *See* Pl.'s SOMF ¶¶ 32(b)-33, 41, 43, 45. Both parties agree, moreover, that even after being shot, the dog charged two other police officers stationed on the staircase, prompting them to take cover behind a protective shield. *See* Pl.'s SOMF ¶ 38. Although, in retrospect, nonlethal force may have been preferable, there is no assurance that it would have succeeded. Given Wrinkles' threatening behavior, the government's interest in safeguarding the lives of its officers, and the pressure of split-second decision-making, I find the seizure eminently reasonable under the circumstances.[7] *See Hatch*, 2003 WL 1610778, at *5 (noting that when a dog poses an imminent threat, the "balance of interests tips away" from the plaintiff). Because Wrinkles' shooting was reasonable and did not violate plaintiff's Fourth Amendment rights, the Court need not determine whether plaintiff's right was clearly established, *see Saucier*, 533 U.S. at 201, and as such, finds that Officers Pezzat, Glynn, and McLeod are entitled to qualified immunity from the seizure of plaintiff's dog.

The second seizure underpinning plaintiff's Fourth Amendment claim—the alleged damage to her personal property during the search—was likewise constitutional. Plaintiff alleges that the defendant officers' search of her premises was unreasonably destructive, owing to several "bullet impacts" from the shooting and the "damage to

---

[7] The cases plaintiff cites in her opposition are inapposite. *See* Pl.'s Opp'n at 7-9. In each case, unlike in the present matter, there was a genuine dispute as to whether the dog posed an imminent threat. *See, e.g., Thurston v. City of N. Las Vegas Police Dep't*, 552 Fed. App'x 640, 642 (9th Cir. 2014) (declining to grant summary judgment for defendants where there was a genuine issue of material fact as to whether the dogs attacked the officers); *Viilo*, 547 F.3d at 710 (declining to enter summary judgment for defendants where several witnesses on both sides "vigorously contested" whether the dog posed an imminent threat).

[plaintiff's] items" from Wrinkles' blood. *See* Compl. ¶ 107. Officers conducting searches must "avoid unnecessary damage to the premises." *Brown v. District of Columbia*, 638 F. Supp. 1479, 1488 (D.D.C. 1986). Property damage is not, however, a per se violation of the Fourth Amendment, and police officers may damage property while executing a valid search warrant if it is reasonable to do so. *See Dalia v. United States*, 441 U.S. 238, 258 (1979) ("[O]fficers executing search warrants on occasion must damage property in order to perform their duty."). This rings especially true in searches for illegal substances, as contraband is rarely strewn in plain sight. Several circuits have held that property damage is reasonable, and often necessary, to find concealed drugs. *See, e.g., United States v. Whisnant*, 391 Fed. App'x 426, 429-30 (6th Cir. 2010) (holding that officers could reasonably search interior walls for contraband); *United States v. Becker*, 929 F.2d 442, 446-447 (9th Cir. 1991) (holding that officers could reasonably destroy a concrete slab in their search for contraband). Reasonableness is, of course, a subjective inquiry, and hinges on "the particular facts of the case," including the breadth of the search warrant, *Tarpley v. Greene*, 684 F.2d 1, 9 (D.C. Cir. 1982), "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted," *Bell v. Wolfish*, 441 U.S. 520, 559 (1979).

The damage here was reasonable under the circumstances. As discussed previously, the immediate damage to plaintiff's clothing, furniture, and walls from Wrinkles' shooting was incident to a reasonable seizure and, therefore, is within the realm of constitutionality. I find, moreover, that any subsequent damage to plaintiff's personal items was the product of a reasonable search. A broadly-worded warrant

authorized defendants to search plaintiff's residence for concealed drugs. *See* Defs.' Mot. Ex. 5(b). Acting under the auspices of this warrant, the defendant officers had every reason, indeed, every right, to search in closets, beneath sofas, and behind picture frames for concealed drugs. *See United States v. Ross*, 456 U.S. 798, 821 (1982) ("[A] warrant that authorizes an officer to search a home for [contraband] also provides authority to open closets, chests, drawers, and containers in which the [contraband] may be found."). That Wrinkles' blood made its way onto plaintiff's fixtures as the officers turned on light switches, lifted furniture, and removed wall hangings is neither remarkable nor unduly destructive. Courts have allowed far greater incursions and I find no evidence that this search exceeds the bounds of reasonableness. Accordingly, because the damage resulting from the defendant officers' search was constitutional, I find that they are entitled to qualified immunity for any damage incurred during the search.

## II. Section 1983 Claim Against the District of Columbia (Count III)

Regardless of the nature of the underlying allegations, the District of Columbia can be liable under 42 U.S.C. § 1983 for any constitutional deprivations suffered by plaintiff if "there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978) (section 1983 "imposes liability on a government that, under color of some official policy, 'causes' an employee to violate another's constitutional rights"). A direct causal link can be shown in two ways. Either a municipal body may cause a constitutional tort through the adoption and promulgation of a formal policy, *Monell*, 436 U.S. at 690, or, in the absence of a formal

policy, through a "custom" that is so pervasive "as to have the force of law," *Board of the County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 404 (1997). In all events, the municipality's liability can be predicated "only [upon] acts for which the municipality itself is actually responsible." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1978).

A municipality's failure to train its employees can suffice as a "custom" or "policy" under 42 U.S.C. § 1983 if that failure evidences "'deliberate indifference' towards the constitutional rights of persons in its domain." *Daskalea v. District of Columbia*, 227 F.3d 433, 441 (D.C. Cir. 2000) (quoting *City of Canton*, 489 U.S. at 388-89 & n.7). Such indifference attaches only when "the need for more or different training *is so obvious*, and the inadequacy *so likely* to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton*, 489 U.S. at 390 (emphasis added). This is a difficult standard to meet, and municipal liability "is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 131 S.Ct. 1350, 1359 (2011).

Plaintiff here has not sustained her burden. She can point to no formal policy sanctioning the indiscriminate killing of household pets, let alone one that catalyzed the shooting here. Plaintiff's claim appears to rest instead on the exclusion of animal shootings from the MPD's definition of "serious use of force." *See* Compl. ¶ 115. Even if this definition evidences some indifference to the lives of animals—and it plainly does not—it is overridden by a clear policy restricting the use of deadly force to self-defense. *See* Defs.' Mot. Ex. 14, at 000125 [Dkt. #24-17]. Plaintiff's reliance on a purported

pattern of domestic animal shootings to establish a "custom" of municipal misconduct does not salvage her claim. *See* Compl. ¶ 113. A record of prior animal shootings neither amounts to a "pattern" of civil wrongdoing, nor portends future transgressions. To the contrary, even if these incidents placed the District on notice of domestic animal shootings, plaintiff has tendered no evidence suggesting that the majority of these shootings were unconstitutional. As such, there is no evidence that the District was "faced with actual or constructive knowledge that its agents [would] probably violate constitutional rights." *See Dormu v. District of Columbia*, 795 F. Supp. 2d 7, 26 (2011).

Straining mightily to make her case, plaintiff further alleges that the District, armed with knowledge of domestic animal shootings, adopted a "policy of inaction" by failing to properly train its officers. *See* Pl.'s Opp'n, at 23. Even if plaintiff had shown—and she plainly has not—that notice of past animal shootings created an atmosphere of "deliberate indifference," her claim fails because plaintiff has not articulated how improved training would have prevented Wrinkles' death. Plaintiff argues that had the municipality instituted a "standardized practice" for securing dogs and equipped its officers with "nonlethal means of safely subduing dogs," Wrinkles may not have been killed. *See* Pl.'s Opp'n, at 18. This assumes too much. Claims that "better or more training" could have averted harm can be made "about almost any encounter resulting in injury" and are a flimsy basis for liability. *City of Canton*, 489 U.S. at 391. It is impossible to say with any degree of certainty that additional training would have elicited a different response. Wrinkles was killed because she threatened the safety of the MPD officers conducting a legal search. Even if the city implemented "standardized"

procedures and the defendant officers had received additional training, there is no assurance that these procedures would have averted the shooting. Accordingly, I find no evidence that the municipality ratified an unconstitutional policy and hold that defendants are entitled to summary judgment on this count.

### III. Supplemental Jurisdiction Over Plaintiff's Common Law Claims (Counts IV-VIII)

Each of plaintiff's remaining claims—assault (Count IV), intentional infliction of emotional distress (Count V), negligent infliction of emotional distress (Count VI), negligence (Count VII), and conversion (Count VIII)—asserts violations of District of Columbia law. When the remaining issues arise purely under state law the Court may— and in this instance, does—decline to exercise supplemental jurisdiction under 28 U.S.C. § 1367(a). Federal district courts are given supplemental, or pendant, jurisdiction over state law claims that "form part of the same case or controversy" as the federal claims over which they have original jurisdiction. 28 U.S.C. § 1367(a). Supplemental jurisdiction is not obligatory and a federal court may "decline to exercise" such jurisdiction if it has "dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).

When deciding whether to exercise supplemental jurisdiction, federal courts consider various factors, including "judicial economy, convenience, fairness, and comity." *Shekoyan v. Sibley Int'l*, 409 F.3d 414, 424 (D.C. Cir. 2005). Nonetheless, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendant jurisdiction doctrine . . . will point toward

declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988); *see also Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1267 (D.C. Cir. 1995) (finding the discretion set out in *Carnegie-Mellon University* "unaffected by the subsequent enactment of 28 U.S.C. § 1367(d), in the Judicial Improvements Act of 1990").

Here, the equities militate in favor of dismissal. Plaintiff alleges numerous common law tort claims, at least one of which involves unsettled questions of timeliness. *See* Defs.' Mem. of P. & A. in Supp. of Defs.' Mot. for Summ. J., at 30-32 [Dkt. #24-1]. The District of Columbia Superior Court is eminently more qualified than a federal court to navigate the contours of the local statutory and common law questions raised by plaintiff's complaint. The process, moreover, of deciding plaintiff's myriad state law claims could fairly be characterized as an undertaking to resolve "complex issue[s] of State law" more appropriately left to the local court. *See* 28 U.S.C. § 1367(c)(1). The remaining factors—judicial economy and convenience—provide no serious counterweight and, indeed, favor judicial restraint. There has been no trial, and the Court has had no prior occasion to consider plaintiff's claims in any great detail. Furthermore, under the circumstances, where the locus of the alleged harm is in the District of Columbia, there "seems little difference in convenience for the parties whether they litigate in D.C. or federal court." *See Edmondson & Gallagher*, 48 F.3d at 1267.

The Court can conceive of no unfairness to the litigants from its decision to decline supplemental jurisdiction, as 28 U.S.C. § 1367(d) tolls the statute of limitations during the pendency of the federal case and for at least 30 days thereafter. *See Shekoyan*,

409 F.3d at 419 (affirming the district court's finding that because of this tolling, dismissal of pendent state claims "will not adversely impact plaintiff's ability to pursue his District of Columbia claims in the local court system"). To coin our Circuit's turn of phrase, the Court has "an obligation to exercise its discretion to remand the case to the District of Columbia courts once the federal question, like Elvis, ha[s] left the building." *See Araya v. JPMorgan Chase Bank*, 775 F.3d 409, 418-19 (D.C. Cir. 2014). The Court accordingly cedes supplemental jurisdiction and dismisses plaintiff's nonfederal claims without prejudice. Plaintiff may bring her remaining claims, if not barred, in the appropriate local court.

## CONCLUSION

Accordingly, for all the foregoing reasons, the Court will GRANT defendant's motion for summary judgment [Dkt. #24] on Counts I, II, and III of the Complaint. The Court declines to exercise supplemental jurisdiction over the Counts IV, V, VI, VII, and VIII of the Complaint and DISMISSES those counts WITHOUT PREJUDICE. An Order consistent with this decision accompanies this Memorandum Opinion.

*[signature]*
RICHARD J. LEON
United States District Judge